In re Farrell.

## In the matter of WILLIAM E. FARRELL.

1. In proceedings in lunacy upon a commission in the nature of a writ *de lunatico inquirendo*, where the alleged lunatic is found to be of sound mind or the commission is superseded before a guardian is appointed, the prosecutor cannot be allowed his costs and expenses, however meritorious his conduct may have been, there being no fund out of which they can be directed to be paid.

2. The act of March 23d, 1887 (*P. L. of 1887 p. 48*), does not, in such case, authorize the charge of the fees of jurors and commissioners upon the estate of the alleged lunatic if he shall be found to be of sound mind.

On motion for the allowance of costs and expenses from the estate of an alleged lunatic, who died before inquisition of lunacy had.

Frank W. Farrell, a brother of William E. Farrell, sued out a commission in the nature of a writ *de lunatico inquirendo*, under which inquest was had in November, 1892. A jury was summoned and, after a protracted inquiry, the commissioners and jurors made return to the commission that, at the time of the inquest, William E. Farrell was of sound mind, memory and understanding, capable of the government of himself, his lands, tenements, goods and chattels. Late in February, 1893, upon

application of Frank W. Farrell, the chancellor reviewed the evidence which had been taken at the inquest, and, upon the 4th of March in the same year, being of opinion that the finding was clearly against its weight, set the inquisition aside and ordered that a new commission issue.   On the 9th of the same month, before a new commission was issued, William E. Farrell died, childless, leaving an estate valued at about $150,000. Immediately after his death, his father, brothers and sister filed caveats to prevent the probate of any paper purporting to be his will.   Later, his widow and one Henry H. Barton offered for probate, to the ordinary, such a paper, in which they, respectively, were nominated as its executrix and executor, and which, in terms, bequeathed and devised to the widow the greater part of the decedent's estate.   Probate of that paper was resisted by the next of kin, and contest touching its validity as a will was commenced and is yet pending.

Shortly after the litigation was begun, the widow and Henry H. Barton and, as well, the next of kin, by separate bills, applied to this court to conserve the property pending the contest in the prerogative court, and the chancellor, having first consolidated the suits commenced by the two bills, took custody of the estate, through the instrumentality of a receiver, merely for the purpose of preserving the same pending the determination of the right to probate of the will and administration of the estate.

Frank W. Farrell now applies, by petition entitled both in the lunacy proceedings and in the suit to conserve the property of the decedent, to be paid out of the estate of William E. Farrell the costs and his expenses in the lunacy proceedings, which will include his necessary petty cash disbursements, witness fees and expenses, stenographer's charges, fees of the sheriff and jurors, and such just allowances to the commissioners and his counsel as this court may see fit to award.

The proponents of the will demur to the jurisdiction of the court in the premises.

In re Farrell.

*Mr. Herbert A. Drake* and *Mr. George M. Robeson,* for the motion.

*Mr. Samuel H. Grey, contra.*

THE CHANCELLOR.

In *The matter of Curtis White,* 2 *C. E. Gr.* 274, application was made to Chancellor Green to compel the party at whose instance a commission in the nature of a writ *de lunatico inquirendo* had issued, the return thereto being that the subject of the commission was of sound mind, to pay costs. The chancellor, being satisfied that the proceeding had been instituted in good faith, for the benefit of the alleged lunatic, denied the motion, remarking that, in such case, the petitioner, in justice, should be allowed his proper costs, whether the lunacy be established or not, adding, however, this language : " But if the party be found of sound mind or the commission be superseded before a guardian is appointed, the prosecutor canot be allowed his costs, however meritorious his conduct may have been, there being no fund out of which the chancellor can direct them to be paid."

The language quoted was substantially taken from *1 Coll. Lun.* 461, and accurately states the rule upon this subject, which existed in England prior to the statute 25 and 26 *Vict. c. 86,* the eleventh section of which provides that the lord chancellor may order the costs, charges and expenses of and incidental to the presentation of any petition for a commission in the nature of a writ *de lunatico inquirendo* or for any order of inquiry under the Lunacy Regulation act of 1853, and of and incidental to the prosecution of any inquiry, inquisition, issue, traverse or other proceedings consequent upon such commission or order, to be paid either by the party who shall have presented the petition or out of the estate of the alleged lunatic, or partly in one way and partly in another, as he shall in each case think proper, which order " shall have the same force and effect as orders for the payment of money made by the high court of chancery in cases within its jurisdiction."

In the case *Ex parte Ferne,* 5 *Ves.* 832 (*1801*), Ann Ferne,

In re Farrell.

upon inquisition, was found to be of unsound mind, so as not to be able to manage herself or her property, and, upon the trial of the traverse of that inquisition, such traverse being a matter of right in one who was capable of understanding it (*2 and 3 Edw. VI. c. 3 § 6; Shelf. Lun. 148*), was found to be of sound mind and capable of governing herself and her property. The commission was thereupon superseded. The petitioners then asked for costs from the lord chancellor, claiming to have established lunacy at the time of the inquisition. Upon these facts, the lord chancellor, Loughborough, said: "Where is the fund to pay the costs? Where the commission is superseded there can be no fund. There is a step to be taken—possession to be taken of the property. The traverse stops that. The land and goods have never come into the hands of the crown. The traverse is *de jure*. It was no favor. The parties apply by petition, stating that they are dissatisfied with the finding, and that stops the commission. There is no *amoveas manus* here. If I could act *cum imperio*, it is a very proper case, and the parties have entitled themselves to all the costs I can give them; but I have no jurisdiction."

In *Sherwood* v. *Sanderson, 19 Ves. 280 (1815)*, on petition of relatives and after her examination by physicians appointed by the chancellor, a commission issued to inquire into the lunacy of Kitty Sherwood. It was found that she was of unsound mind. Leave to traverse was granted and then costs were asked. Lord Eldon said that after the inquisition came the right to traverse, and added: "No grant therefore of the custody of the person or estate can be made; and the person issuing the commission, if there is no fund in his hands, cannot make an order as to the costs. When the determination of the party to traverse is made known, I am bound to put the soundness of the verdict in that course of inquiry; in the interval everything with regard to the dominion over the property of the person is stopped, and the consequence is that it is impossible to make any order about the costs, as there is no fund upon which they can attach." This case was stronger than the case of *Ex parte Ferne*, for it is noted that in it the traverse had not yet been tried and the inquisition

In re Farrell.

was not overthrown. I shall refer to this case again upon another point.

In *Ex parte Glover, 1 Meriv. 268 (1816)*, before a committee had been appointed under the inquisition which found its subject to be of unsound mind, a *supersedeas* was asked because of the recovery from the unsoundness of mind, and thereupon costs were petitioned for. Lord Eldon refused to allow the costs because there was no fund upon which his order for their payment could attach.

In *The Matter of Pinks, L. J., Ch., vol. 12 p. 57*, upon inquisition, William Pinks was found to be of unsound mind, but before a committee was appointed he died. The executor of his will would not pay the costs of the lunacy proceedings, and the chancellor (Lord Lyndhurst) being applied to, refused even to ascertain the costs without prejudice to the mode of recovery, saying that as he was not in possession of the estate he had no jurisdiction in the premises.

In *The Case of Loveday, 1 De G., M. & G. 275 (1851)*, there was an inquisition upon which Loveday was found to be of unsound mind, and a traverse of it, upon the trial of which he was found to be "*now*" of sound mind, no reference being made to his condition at the time of the inquisition. An order had been made to refer the taxation of the petitioner's costs to a master, but no grant of the lunatic's property had been made. A *supersedeas* was asked for and granted. Lord Justice Cranworth thought that the case was a proper one in which to allow costs, but as there had been no grant of the property, and consequently as there was no fund, he could not allow them, even though the statute (*6 Geo. IV. c. 53*) permitted grant of the property after an inquisition finding lunacy and before the trial of its traverse. The application for costs came after the trial of the traverse, at which the subject of the proceedings was found to be of sound mind before the grant and when there was no lunacy to justify a grant.

In an anonymous case, reported in *4 De G. & J. 103 (1859)*, upon petition for *supersedeas*, on recovery after being found a lunatic, no committee having been appointed, the father of the

person who had been lunatic, who had sued out the commission, asked for the payment of his expenses, and the court decided that it had no authority to make the desired order.

It is remembered that originally the king, as *parens patriæ*, had custody of idiots and lunatics and their property, the estate of the former yielding him revenue, and that it was his habit to commit such persons and property to the care of committees. Later, to avoid solicitations and the shadow of undue partiality in the bestowal of such offices, he became accustomed, by warrant under his royal sign manual, to delegate his power in such matters to the chancellor, who was the keeper of the great seal under which grant, by letters-patent to the committee, was made.

It became the practice of the chancellor, first, to inquire into the idiocy or lunacy, and to that end to issue a commission under the great seal, directed to persons as commissioners, who were to inquire through a jury as to the matter given them in charge by the commission; and after a return to the commission, finding idiocy or unsoundness of mind, as the case might be, and trial of a traverse of the inquisition, if the subject of the inquisition should possess sufficient intelligence to wish to traverse, to proceed to grant the custody of the person and property of the idiot or lunatic to a committee. It was after such grant to a committee that there became a fund from which costs and expenses could be paid. That fund originally and until after our separation from England, was not in the court of chancery but within control of the chancellor, acting in virtue of the king's warrant. Until the office of committee was found by the inquisition and the grant of it was made under the great seal, the chancellor was powerless to reach out and take the costs and expenses of the inquisition from the estate of the person who was the subject of the inquiry.

This condition of affairs continued in England until the statute of *25* and *26 Vict. c. 86 (1862)*, already referred to, which authorizes the allowance of costs and expenses, if the chancellor shall think proper, out of the estate of the alleged lunatic, and provides as a means of giving effect to the order which he may make, that the order shall have the same force and effect as an

In re Farrell.

order for the payment of money made by the high court of chancery in cases within its jurisdiction.

It is in virtue of the authority of this statute that orders for payment of costs were made in subsequent cases, which have been cited to me. *Matter of F., 2 De G., J. & S. 89 (1863)*; *Re F., L. J., 33 Ch. App. 333; In re C., L. R., 10 Ch. App. 75 (1874); In re E. S., 4 Ch. Div. 301 (1876).*

In this state the act of November 21st, 1794 (*Pat. L. p. 125*)—similar in terms to the statute *de prœrogativa regis* (*17 Edw. II. A. D. 1324*), which confirmed in the king power over the persons and property of idiots and lunatics—provided that *the chancellor*, who, it is remembered, under the constitution, was then governor of the state, should have the care of idiots and lunatics and provide for the safe keeping of them and their lands and tenements, goods and chattels, that they and their household might be supported, that no waste and destruction should come to their property, and that in case of their recovery their estate should be restored to them; otherwise, at their deaths, should go to their heirs and next of kin.  In March, 1804, by supplement to the last-mentioned act, it was provided that all cases of idiocy and lunacy should be determined by inquest on commission issued by the *chancellor* according to the then existing practice, and that the chancellor should transmit to the orphans court of the county in which the lunatic should reside a certified copy of all the proceedings, which should be filed and recorded in the surrogate's office of that county, and that the orphans court should appoint a guardian who should care for the lunatic and his property.  The orphans court also was to direct the sale of chattels and lands, if necessary, for the payment of the lunatic's debts and the support of him and his household.

In February, 1820 (*P. L. of 1820 p. 91*), the statutes of 1794 and 1804 were repealed, and it was enacted that the commission in lunacy should thereafter issue out of the *court of chancery* and be returnable thereto, and that when lunacy should be found, *the chancellor* should cause a copy of the proceedings to be transmitted to the orphans court of the county in which the lunatic resided, and then, on further application to it, the

orphans court was to appoint a guardian. The orphans court was empowered to direct the sale of the lunatic's property for the payment of his debts and his support, and to pass upon the guardian's accounts, to be rendered to it. Thirty years later, in 1852 (*P. L. of 1852 p. 91*), the power to direct the lunatic's guardian in making necessary sales of lands was transferred to the chancellor.

The law thus existing, with little addition, remains at this day, having been re-enacted in the Revisions of 1846 and 1874. Its scheme is that the court of chancery shall possess requisite jurisdiction to find the lunacy and that the orphans court shall possess the power to appoint the guardian, who shall possess and care for the lunatic and his estate. Under this scheme it has been the practice, when lunacy is found, as part of the proceedings, to have the costs ascertained and taxed in chancery and certified to the orphans court, in anticipation of their being paid from the fund when had, and they are, in fact, paid by the guardian, when appointed, out of the lunatic's estate.

It, very plainly, is the purpose and effect of our legislation upon this subject, that the court of chancery shall not have jurisdiction over the guardian or fund in virtue of the lunacy proceedings before it. The end of such proceedings is reached when lunacy is found, and the mere fact that such proceedings were had under the court's control cannot give it jurisdiction over either the guardian or the lunatic's estate. I understand, then, that the court of chancery has no jurisdiction over the guardian thus appointed, other than that which arises from its general power as a court of equity, to enforce and protect trusts when that power shall be duly invoked.

In this situation of our law, it is obvious that the English rule, as stated by Chancellor Green, should control in the determination of this application. There being no office found, and neither guardian nor fund in prospect, there should be no allowance of expenses in the lunacy proceedings.

It is, however, insisted that the act of March 23d, 1887 (*P. L. of 1887 p. 48*), introduces a new rule, which contemplates payment from the estate of the subject of the inquisition, even

In re Farrell.

though no office should be found. It is noted that that act authorizes the chancellor to "*allow*" the commissioners reasonable compensation and the jurors fixed fees, and concludes with this language: "*the same to be paid out of the estate of the person who is the subject of the inquisition.*" It is observed that the statute embraces only a portion of the expenses of the inquisition. It plainly does not include all that the petitioner now asks for. It was enacted, in view of the established rule that expenses cannot be had in the lunacy proceedings where no office shall be found, yet it not only fails to make any provision for the enforcement of the allowance in such a case, as does the statute of Victoria, but also fails to expressly state its contemplation of such a case. By the use of the word "allow," it appears, impliedly, to premise a fund in court. Whatever question there may be as to the statute's meaning, arises in its concluding clause, which, taken literally, may apply to a status made by any finding upon the lunacy.

I think, however, that the use of the word "allow" and the absence of provision for the enforcement of the allowance where lunacy is not found, makes it very doubtful that the legislature intended the statute to have the meaning insisted upon. The legislative purpose to provide more liberal payment to commissioners and jurors than the then existing law permitted, is conspicuous, but it is by no means clear that its purpose was also to confer upon the court the perhaps constitutionally questionable right to reach out and seize the estate of a person who is adjudged to be of sound mind.

I cannot presume that further change in the existing law was intended than is plainly expressed or necessarily implied in the new statute. Existing law is not to be changed by doubtful implication; hence, I would not be justified in holding that the statute in question has the meaning contended for.

Passing to another point. In the case of *Sherwood* v. *Sanderson,* already cited, although Lord Eldon refused costs, on the ground that there was no fund within his control in the lunacy proceeding, he allowed them from a fund belonging to the alleged lunatic, which was in the court of chancery in another proceed-

In re Farrell.

ing, upon the ground that the alleged lunatic was to be regarded as standing in the character of an improvident person, whose moneys were in court and would .be protected and applied for her benefit; and, as the allowance of costs appeared to be necessary to secure the effectual trial of the pending traverse of the inquisition, which the alleged lunatic had demanded, and therefore was for her benefit, he would pay the costs out of the fund in the court.

It is obvious that this decision is not an apt precedent in the present application. The proceedings in lunacy here have abated by the death of their subject, and his benefit, by their continuance, is no longer a question. The fund at this time controlled by the court was formerly the property of the subject, but it is not now held for him. It is, at present, simply conserved by the court pending the appointment of a lawful guardian and protector of it. In no sense is it the property of an improvident person, which the court may use in his benefit. It is the fund that is helpless and needs the court's ministration, not the owner or owners of the fund. Until such owner or owners are ascertained and appear, every dictate of justice requires that the fund shall not be in the least depleted, except by the necessary expense of its own preservation.

The present application, as stated, is by petition in the lunacy matter and in the suit for the preservation of the property. The subject of the inquisition is dead. Although his heirs, next of kin, legatees and devisees may have notice of the application, no legal representative of his estate is before the court. His creditors are, therefore, not represented. The application was not pending before his death. In such case the motion should be denied. *Ex parte McDougal, 12 Ves. 384.*

It may possibly be that, by original bill, claiming an equitable indebtedness chargeable upon the estate of the decedent, the petitioner may succeed, but that question does not now properly arise, and I do not express an opinion upon it.

I will sustain the demurrer.