HOWARD M. COOPER, guardian of Christopher A. Bergen,
a lunatic,

*v.*

SUSAN WALLACE et al.

1. The guardian of a lunatic may ask the court for instructions concerning
the scope of his power to deal with the estate; or in case the power clearly
exists, but is discretionary, as to the wisdom of exercising it in a particular
method.

2. The guardian of a lunatic is a mere curator, without title in his ward's
property, and, aside from power to make necessary repairs and improvements,
can exercise no control over the estate, unless authorized by statute.

3. Equity has no power to order the guardian of a lunatic, on a bill by the
guardian, to which his ward is not a party, to transfer real estate which the
lunatic held in trust, to the beneficiaries or their nominees.

On final hearing.

This bill is filed by Howard M. Cooper, the guardian of
Christopher A. Bergen, to obtain the instruction of the court
respecting his duties as trustee, and for other relief. The bill
sets out a decree under date of September 18th, 1895, made
upon a commission of lunacy, declaring Christopher A. Bergen
a lunatic, and the subsequent appointment by the orphans court
of Camden county of the complainant as guardian. It then sets
out that Christopher A. Bergen, at the time of the making of
the decree, was the administrator of the estate of one John
Wallace, and that there was in the hands of the administrator
of the estate of Wallace the sum of $1,930, which, under the
will of Wallace, was to be held for the widow of Wallace, viz.,
Susan Wallace, for life, and after her death was to be paid to
the children of John Wallace, in equal shares.

It then sets out that the said Christopher A. Bergen was, with
one Joseph J. Read, a joint administrator and trustee of one
George V. Voles, and that of the estate of said Voles there was

in the hands of the said Christopher A. Bergen the sum of $17,002.10.

The bill charges that so far as can be ascertained, a property known as No. 584 Clinton street, Camden, standing in the name of the said Christopher A. Bergen, belongs to the estate of said Voles; that there was, and is, in the hands of Joseph J. Read the sum of $13,620.76; and that the balance of the property of the estate of Voles is invested in property in Bridgeboro, Burlington county, in the name of George V. Voles.

The bill then states that the said Christopher A. Bergen was the guardian of his two children, George J. and Martin V. Bergen, and that there was in his hands, as guardian for said children, the sum of $787.34.

The bill then sets out a list of properties standing in the name of Christopher A. Bergen.

The bill then sets out the amount of personalty belonging to Christopher A. Bergen, within the knowledge of the complainant.

The bill then sets out some real estate which, it is alleged, belong to the firm of Bergen & Bergen, but the legal title to which stand in the name of Christopher A. Bergen.

The bill then sets out certain properties, which, it is alleged, belongs to the firm of Bergen & Bergen, of which Christopher A. Bergen was one, but which stands in the name of Martin V. Bergen, the other partner.

Among the lots of land standing in the name of Christopher A. Bergen which, it is stated, belong to the firm of Bergen & Bergen, is one in Gloucester city, Camden county, which, it is alleged, was conveyed to Christopher A. Bergen by its owner, Jacob Koehler, to secure to the firm of Bergen & Bergen the amount charged by them for services in their profession rendered, and for money advanced by them, to Koehler, with a trust imposed upon Bergen & Bergen to reconvey the said property to Koehler upon payment of said amount; that there is due the sum of $72.47, with interest, upon the payment of which sum Koehler is entitled to a reconveyance.

The bill then states that three properties—No. 528 West

street, Nos. 337, 339 and No. 334 Pine street—were conveyed to Christopher A. Bergen to secure the firm of Bergen & Bergen, for moneys paid by them in behalf of the estate of one Valentine Noll; that by an agreement dated September 22d, 1887, entered into between Christopher A. Bergen and Margaretta Noll, the widow of Valentine, who is now dead, and who had a life estate under the will of her husband, and also by the beneficiaries, Charles Noll, Christina Subers, Clara A. Ogden and John Noll, it was agreed that No. 528 West street was to be held in fee by Christopher A. Bergen, in full payment for all advances upon that property and on the other two properties, and a deed was so made that Christopher A. Bergen was to hold the other two properties subject only to future advances as trustee.

The bill states that lots Nos. 26 and 40, on the T. H. Dudley plan in Atlantic City, Christopher A. Bergen, by his verbal agreement, agreed to sell to George M. Fisher for the sum of $6,850, and such other moneys as the said Bergen should thereafter expend thereon, and interest, and that Fisher is in possession of the said property under said agreement. The prayers of the bill are that trustees may be appointed in the place of Christopher A. Bergen for the Wallace and the Voles estates; that an accounting may be had of the amount due from Christopher A. Bergen to the Wallace estate and to the children of the lunatic; that the guardian may be directed as to the manner he may raise money to pay the said *cestuis que trust* or what property he may transfer to said trust estates, and that he may be decreed to convey the same; that if it should be decreed that Fisher is entitled to purchase the property in Atlantic City, that he may be decreed to pay for the same, and the guardian may be decreed to convey the same to Fisher; that the guardian, upon the payment by Koehler of the amount due from him to the firm of Bergen & Bergen, may be decreed to convey the Gloucester city property to him, and with the same prayer respecting the Roth property.

*Mr. Howard M. Cooper*, for the complainant.

*Mr. J. E. P. Abbott*, for George M. Fisher.

*Mr. Philip Scovel*, for the estate of John Wallace.

*Mr. Martin L. Haines*, for Moles & Scilley.

REED, V. C.

This bill is filed by the guardian of a lunatic in his own name. The guardian puts his right to stand as complainant upon the ground that he is a trustee; that the duties which devolve upon him in dealing with the property of his ward are perplexing; that he therefore has the right to ask this court to instruct him concerning the course he shall pursue in adjusting the complication in which the estate of the *non compos* is involved.

It is entirely settled that where the duty of a trustee is a matter of doubt, it is his right to ask and receive the aid and direction of a court of equity in the execution of his trust. *Kearney* v. *Macomb, 1 C. E. Gr. 189.* Although the guardian of a lunatic has no title to the property of his ward, either in trust or otherwise, yet as the care-taker of the estate of the *non compos* there may clearly occur occasions when the direction of a court of equity may be properly invoked concerning the line of conduct which the guardian should follow in his efforts to pre-serve the estate. Besides those duties which inhere in the nature of his authority over the property of the lunatic, there are other duties which, by statute, he can perform only by direction of the orphans court which appointed him *or* by order of the court of chancery. It may be conceded, then, that a guardian can ask the court of chancery for instructions concerning the scope of his power to deal with the estate in his hands; or in case the exist-ence of the power is clear, but discretionary, that he can seek instruction as to the wisdom of exercising it in a particular method. Conceding to the guardian this right, let us turn to the bill in the present suit to ascertain the scope of the aid sought.

A glance at the bill is sufficient to disclose that while it asks for instructions in a general way, its most important purpose is to procure decrees by which the legal title of the lunatic to certain real estate may be transferred to other parties, in whom it is alleged an equitable right to such property resides.

It is entirely clear that so far as the bill is one for instruction, the court can only declare what is the extent of the guardian's power over this property; or granting his power, can only declare whether there is such a condition of affairs as would justify its exercise. Unless power is found to inhere in the guardian by virtue of his appointment, either with or without statutory authorization, no declaration of this court can confer it.

It is to be kept in mind that to this bill the lunatic himself is not a party. No decree, therefore, in such a suit, purporting to transfer the lunatic's interest in any of this property, or which ordered the *non compos* to make such transfer, would possess the least force against the lunatic himself.

The court must therefore content itself with the declaration of the scope of the guardian's power to deal with the lunatic's property in respect of the purposes sought to be accomplished by this bill.

The power which inhered in the committee of a lunatic under the English jurisprudence was confined within very narrow bounds. The committee was the mere bailiff or curator of the lunatic's property, appointed by the chancellor for the crown, for the purpose of preserving the estate of the *non compos.*

To conserve the purpose of preserving such estate, he could use any moneys in his hands for the purpose of repairing buildings belonging to the lunatic. He could cut timber upon the real estate and use it for the same purpose. He could, with the consent of the chancellor, cut timber, particularly decaying timber, to pay a debt of the lunatic, which was admittedly due. *1 Coll. Lun. 274.*

The power of the committee, in England, to sell the land of his ward, even for the payment of debts, by direction of the chancellor, did not exist until conferred in 1803, by the statute. *43 Geo. III. ch. 75 § 4.*

Cooper *v.* Wallace.

The power to make leases of the lunatic's land was conferred by the same statute. The power to renew leases for lives or for years, under the direction of the chancellor, was conferred by another statute—that of *11 Geo. III. ch. 20.* The power to surrender leases in order to obtain renewals was conferred by still another statute—that of *29 Geo. II. ch. 21.* The power of the committee to raise money to pay the lunatic's debt by mortgaging the lunatic's property was conferred by statute. *1 Coll. Lun. 286.*

Then there are other English statutes, which, if existing here, would be sufficient to confer power upon the guardian to meet the exigencies of the present case. Thus, by the statute *4 Geo. II. ch. 10* the *non compos,* or committee in his name, under authority of the chancellor, might convey property of which he was trustee, to the persons beneficially entitled to it, or as they might direct.

So, by statutory direction (*4 Geo. II. ch. 10*), the committee might be ordered to convey property of which the *non compos* was seized or possessed as mortgagee, to the persons entitled to redemption, or as they shall direct, upon payment of what is due upon the mortgage.

So, by statutory direction (*43 Geo. III. ch. 75 § 1*), the committee might, under the direction of the chancellor, fulfill a contract entered into by the *non compos.*

In practice, these powers were exercised upon petition presented to the chancellor by the persons beneficially entitled, praying for such conveyance, assignment or surrender.

All the powers which, by a succession of statutes, had been conferred upon the committee or upon the chancellor, as well as some additional powers, were united in the English Consolidated Lunacy act of 1890. *7 Chit. Eng. Stat., tit. "Lunatic."*

It is therefore perceived that, aside from the authority which was from time to time granted by parliament, the power of the committee without, or even with, the consent of the chancellor, was of the simplest kind, being merely such as were essential to the temporary preservation or improvement of the lunatic's estate. Even for that purpose, the right to sell any of the real property of the ward did not exist.

Now, as pointed out in the case of *Van Horn* v. *Hann, 10 Vr. 207*, the guardian of a lunatic in this state is, like the committee, a mere curator, without title in the property of the lunatic. As such curator, he possesses the power to repair and improve, such power being confined within the lines already indicated as limiting the authority of the committee in England. The right to exercise any control over the property of the ward beyond this must be found in some legislative grant.

In turning to our statutes, to ascertain the extent to which legislation has conferred such power, it will be found that it comes far short of the power given by the English statutes. By the act of 1888 (*Gen. Stat. p. 1703 § 31*), power is conferred upon the orphans court or upon the chancellor to order the guardian to sell the real estate of a lunatic if he is indebted to any person, or if any person has advanced money or purchased necessaries, or rendered services for his care or maintenance or for the preservation of his estate, beyond the ability of the lunatic to pay the same out of his personal estate, or, in case the personal estate, with the profits of the real estate, shall be insufficient to support the lunatic.

By the act of 1885 (*Gen. Stat. p. 1701 § 26*), the chancellor may order the sale of any real estate of a lunatic, whenever he thinks that the interest of the lunatic will be substantially promoted thereby.

By the act of 1885 (*Gen. Stat. p. 1701 § 25*), the chancellor may order the sale of partnership property, real as well as personal, whenever one of the partners becomes a lunatic.

These statutes, so far as I have discovered, contain the whole of the authority which has been conferred upon the guardian, or, speaking more accurately, embrace the extent of the power of the chancellor to order the guardian to sell the property of a ward. It is perceived that, by force of these statutes, the guardian, by direction of the chancellor, may execute conveyances which will pass a title to the real estate of a lunatic; but it is also perceived that these conveyances are confined to an out and out sale of such lands for the purposes mentioned in the act.

In regard to the execution of any conveyance of the land

held by a lunatic as mortgagee, to complete the mortgagor's right to redeem, or of a conveyance of such property held by a lunatic in trust, for the purpose of executing the trust and putting the title in the beneficiaries, there is nothing in our legislation similar to the English statutes.    There is no power whatever in the guardian to transfer the title of the real estate, which, this bill claims, equitably belongs to the Moles; nor is there power to execute conveyance to Koehler, to Noll, or to Fisher, in case the money for the payment of which these properties are held as security, is tendered.    Neither title nor power resides in the guardian without statutory aid; nor can such title or power be judicially conferred upon him.    The legal title is in the lunatic, and can be divested only by a suit to which the lunatic is a party.    Upon a bill filed by the committee, in the name of the lunatic, to foreclose the equity of redemption in the several properties alleged to be held by the lunatic as equitable mortgagee, an effective decree could be made.    So, by a bill against the lunatic filed by one of those equitable mortgagees to redeem, a decree could be made against the lunatic, which, by force of the statute, would operate as a conveyance.

But in this suit, to which the lunatic is not a party, the court is utterly powerless to make any decree which can affect the primary purpose of the bill, which is to disentangle the snarl arising from the existence of the trust relations of the lunatic to the parties just mentioned, and can only declare that the guardian himself possesses no power to act.

Aside from the prayers for relief in regard to the Voles estate, the Koehler, the Noll, and the Fisher properties, the bill prays that new trustees may be appointed in the place of Christopher A. Bergen, who was trustee of the Voles estate and joint trustee with Joseph J. Read of the John Wallace estate.    Without determining the propriety of making such appointments under this bill, I will decline to do so now, because at present the inability of the guardian to make any conveyance to such trustee, renders such appointment unnecessary.

. Regarding the bill as one for instruction, there is no footing of fact upon which the court can base an instruction.    The

guardian does not ask to sell any particular piece of property, therefore it is impossible for the court to advise what shall or shall not be sold.

I regret that the statute law of this state, in respect of a lunatic's estate, is not as broad as the English legislation, under which the management of this estate would be quite easy.