243 N.J. Super. 97 (1989)
578 A.2d 900
TRUSTEES OF THE CLIENTS' SECURITY FUND OF THE BAR OF NEW JERSEY, PLAINTIFF,
v.
SAMUEL K. YUCHT, DEFENDANT.
Superior Court of New Jersey, Chancery Division Passaic County.
Decided June 30, 1989.
*100 Daniel R. Hendi, Deputy Counsel for Clients' Security Fund appeared. (Kenneth J. Bossong, counsel for Clients' Security Fund, attorney.)
Frank A. Carlet for defendant (Goldman, Carlet, Garrison, Bertoni & Klein, attorneys).
Patricia H. Delzotti for Internal Revenue Service.
*101 DWYER, P.J.Ch.
In connection with filing the final accounting of the custodial receivership for Samuel K. Yucht ("Yucht"), Frank A. Carlet ("receiver"), who had been appointed custodial receiver to succeed the original custodial receiver, who was relieved upon his own application, the receiver also filed a petition for instructions as to the disposition of certain claims, all but three of which have been resolved.
The accounting in summary showed that, from the date of the receiver's appointment on December 15, 1982, the receiver was chargeable with receipts of $26,624.31, sought allowance for disbursements of $10,759.73 and had a balance of $15,864.58. The accounting was approved by order dated June 23, 1988 and distribution held subject to the resolution of the three possible claims.
On October 14, 1982, the original order appointing a custodial receiver upon application of the Trustees of the Client Security Fund of the Bar of New Jersey ("CSF") pursuant to R. 1:28-8 provided in part in paragraphs (f) and (g):
(f) that on notice to the Receiver, all persons with claims against Samuel K. Yucht may take such steps in prosecution of their claims as they deem reasonably necessary to protect their interests up to but not inclusive of the attainment of a judgment and that any entry of any judgment against Samuel K. Yucht or against any of the assets in which Samuel K. Yucht has an interest shall be on application to the court on ten (10) days notice to Receiver, or with the consent of the Receiver.
(g) that such Receiver shall publish notice of his receivership in two (2) newspapers of general circulation in the Passaic County area, and that one of the newspapers shall be a Spanish language newspaper.
In the petition for instructions, the receiver stated that in October 1984, the receiver published notice of the order limiting claims of those filed within three months of the order dated October 5, 1984. The claims were to be verified under oath or affirmation.
The receiver reported that he had received only one claim duly verified under oath. That claim was from the United States Internal Revenue Service ("IRS") dated September 26, *102 1983 in the amount of $3,743.77, plus interest, based on seven deficiency assessments. This claim stated in relevant part:
This debt has priority and must be paid in full in advance of distribution to creditors to the extent provided by Law: See Section 3466 of the Revised Statutes (31 U.S.C. 191). Any Executor, Administrator or other person who fails to pay the claims of the United States in accordance with its priority, may become personally liable for this debt under Section 3467 (31 U.S.C. 192).
The receiver also stated that he had been served with a copy of a notice of federal tax lien under internal revenue law dated, and signed by a revenue officer, August 9, 1983. The notice had been filed with the Register of Deeds of Passaic County.
There were two claims:

Tax Period Date of Assessment Date for Refiling
12/31/78 11/05/79 12/05/85 $1,035.79
12/31/81 8/09/82 9/09/88 64.75
 _________
 $1,100.54
 =========

The receiver further stated that he had received copies of statements from the State of New Jersey, Unemployment and Disability Insurance, Employment Security Agency reflecting unpaid contributions, unpaid interest, and unpaid penalties. The copy of the statement attached to the petition indicates that the claims during the period from July 1974 through July 1977 were amounts owed for unpaid interest and penalties. The same was true for January and February 1978. For the periods March 1978 through July 1983 amounts owed were for unpaid contributions, interest and penalties. The totals were:

Contribution ................................ $14,605.65
Interest .................................... 15,903.26
Penalty ..................................... 2,943.72
 __________
Total ....................................... $33,452.63
 ==========

The receiver stated that neither the claim based on the federal notice of lien nor the state claim was verified under oath or affirmation.
The receiver further stated that he knew that the CSF had expended substantial funds in the Yucht matter but no proof of *103 claim was filed. The receiver further stated that he understood that CSF intended to seek reimbursement from the estate.
The receiver sought instructions determining the persons to whom the balance of the funds should be distributed.
Thereafter the CSF filed a motion on notice to the Internal Revenue Service and the New Jersey Employment Security Agency in which CSF requested approval of the accounting and an order directing that all funds, after administration expenses, be paid to the CSF.
Kenneth J. Bossong ("Bossong"), director of, and counsel to, CSF, filed a verified proof of claim. In it Bossong stated that CSF had paid 60 claims aggregating $166,563.82.
He further stated that with respect to claims paid by CSF from its general funds raised by annual payments on those holding plenary licenses to practice law in New Jersey, R. 1:28-2, it had taken assignments and subrogation agreements from the claimants, see R. 1:28-3(e), and pursued others. In most instances Yucht had forged his clients names to settlement checks or drafts and pocketed the money. CSF had recovered $146,477.47.[1]
*104 CSF had thereby suffered a shortfall of $20,086.35 which was more than the $15,864.58 for distribution.
In the Yucht case, counsel for the IRS urges, in a letter brief, that the priority for its lien is based both on the provisions of 31 U.S.C.A. § 3713 (person indebted to the government is insolvent and (i) debtor is unable to pay all debt makes a voluntary assignment ... or (iii) an act of bankruptcy is committed) and, also, under 26 U.S.C.A. §§ 6321 and 6322. Section 6321 provides in relevant part:
If any person liable to pay any tax neglects or refuses to pay the same after demand, ... the amount shall be a lien in favor of the United States upon all property and rights to property, whether real or personal belonging to such person.
*105 Section 6322 states that, unless a different period is fixed by another law, the lien shall be good until paid or judgment thereon satisfied unless barred by lapse of time.
26 U.S.C.A. § 6323 specifies the place for filing notice.
Counsel for the IRS cited In re Holly Knitwear, Inc. v. Solomon, 115 N.J. Super. 564, 280 A.2d 504 (Cty. Ct. 1971), mod. and aff'd 140 N.J. Super. 375, 356 A.2d 405 (App.Div. 1976), and conceded that the IRS was subject to administrative expenses and perfected security interests and liens.
The test for perfected liens was outlined by the trial court In re Holly Knitwear, Inc., supra, as:
The question of whether a state-created lien has the necessary requisites to be exempt from the terms of 31 U.S.C.A. Sec. 191 is a matter wholly within the aegis of federal law. United States v. Waddill, Holland & Flinn, Inc., 323 U.S. 353, 65 S.Ct. 304, 306, 89 L.Ed. 294 (1944).
It is now well settled that this governmental priority based on the above statute can only be defeated by "choate," perfected security interests in existence prior to the time of the obligees' indebtedness to the United States. United States v. Guaranty Trust, 33 F.2d 533, 537 (8 Cir.1929), aff'd. 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556 (1930), and Exchange Bank and Trust Co. v. Tubbs Mfg., 246 F.2d 141, 143 (5 Cir.1957), cert. den. City of Dallas, Tx. v. Tubbs Mfg. Co., 355 U.S. 868, 78 S.Ct. 118, 2 L.Ed.2d 75 (1957).
Further elucidation of the general standards set forth in Guaranty Trust is provided in the cases of United States v. Bond, 279 F.2d 837 (4 Cir. 1960), and Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946). In Bond the court stated that under the "choate lien" test it is required that state-created liens be specific to the point that nothing further need be done to make the lien enforceable. In Illinois ex rel. Gordon v. Campbell the court, by use of a tripartite formula calling for the identity of the subject asset, the lienor and the amount of the encumbrance, added a further embellishment to the general language employed in Guaranty Trust. See also United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).
Thus, it is incumbent upon the landlord to prove to this court that his claim asserted under the provisions of the Loft Act constitutes a lien, which under federal law, will render such claim superior to that of the Federal Government. [Id. 115 N.J. Super. at 575-576, 280 A.2d 504].
....
Here, the facts disclose that the landlord did avail himself of the distress proceedings provided by New Jersey statutory law, N.J.S.A. 2A:33-1 et seq., in an effort to enforce the lien authorized under N.J.S.A. 2A:44-166. Hence, at *106 first impression, assuming arguendo that the restraint was proper, it would appear that in accord with Saidman the requisites of title and possession of the assets found on the premises of the debtor were retained by the landlord. Yet the terms of the distress statute do not so provide. N.J.S.A. 2A:33-9 grants the debtor tenant a grace period of ten days, within which time he can commence an action to regain the goods. Since the alleged distraint occurred on December 15, 1970, nine days remained before the lien reached full fruition. Thus, in no way can the landlord be considered to have had at the date of the assignment for the benefit of creditors, a claim of the quality sufficient to defeat the federal priority.
The Supreme Court of the United States decided in this fashion in a case strikingly similar in its facts to the one at bar. U.S. v. Scovil, 348 U.S. 218, 75 S.Ct. 244, 99 L.Ed. 271 (1955), and our Appellate Division did likewise in an unpublished opinion. There being ample authority to support this result, the Federal Government's claim for taxes due shall be considered superior to the landlord's lien for rents owing. For similar reasons the claims of wage earners and the State of New Jersey shall also be subordinate to the rights of the Federal Government. [115 N.J. Super. at 577, 280 A.2d 504]
On appeal, the Appellate Division affirmed that there was a claim ahead of the United States, but held that the landlord's claim under the Loft Act, N.J.S.A. 2A:44-166, had priority over that claim; hence, from the prior claim the amount of the landlord's claim should be paid. This did not change the priority of the United States claim.
Although no brief was submitted on behalf of the State in the Yucht case, one was submitted in the companion Miller case. The State's position in the Miller case is based on the fact that a certificate of debt ("COD") was filed with the Clerk of the Superior Court on January 2, 1984 pursuant to N.J.S.A. 54:49-1 and 12, hence, it operates as a lien on all the property of the taxpayer. In Yucht, no COD was filed.
In said brief, counsel for the State also cited Clients' Sec. Fund of the Bar of New Jersey v. Beckmann, 143 N.J. Super. 548, 364 A.2d 15 (Ch.Div. 1976) and In re Harry Kampelman, 165 N.J. Super. 352, 398 A.2d 152 (Ch.Div. 1979). The latter decision held that an advancement to pay administration expenses should be treated as administration expenses and accorded priority.
*107 In Beckmann, supra, the court, in part, held that priorities should be based, so far as possible, on the guidelines of the Bankruptcy Act. Under those guidelines priority should be given to tax claims.
Counsel for CSF did not specifically address the claim of the State in the Yucht case but did oppose the State's claim in the Miller proceeding because the State failed to comply with the provision of paragraph (f) entered in the Miller case. Counsel urged that the State filed the COD without obtaining leave of court; hence, such COD should not even be considered.
For purposes of this opinion, the court assumes that counsel for CSF would urge that the State is barred because the State did not file a claim after publication of the order limiting creditors and did not obtain permission to make assessments.
The court notes that in the Yucht matter, the State has not filed a formal proof of claim but did submit evidence of the claim to the receiver.
Counsel for CSF also urges that the nature of the property in the Yucht case is the product of embezzled funds. Tax liens do not attach to embezzled funds or the product thereof. First National Bank v. Hill, 412 F. Supp. 422 (N.D. Ga. 1976); Atlas Inc. v. United States of America, 459 F. Supp. 1000 (N.D. 1978).
The embezzler is subject to tax on the amount of the funds embezzled in the year of the embezzlement. James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). The IRS may impose a lien on the embezzler's property.
Since the embezzler is under a duty to repay to the person from whom the funds were embezzled, such funds or the proceeds are not the embezzler's property to which the IRS lien can attach. See First National Bank v. Hill, supra; Atlas Inc. v. United States, supra.
The law of New Jersey is the same. See Van Blarcom v. Van Blarcom, 123 N.J. Eq. 110, 196 A. 468 (Ch. 1938), aff'd o.b. *108 124 N.J. Eq. 19, 199 A. 383 (E. & A. 1938). In Van Blarcom, the beneficiary sued the estate of a deceased trustee who had taken a check signed in blank by a co-trustee for purposes of paying interest to the beneficiary. Instead, the trustee made the check payable to his own order and withdrew principal with which he built a home.
The court held, based on the evidence, that the widow knew that the house had been built with the trust funds. The court said:
It is well settled that persons who deal with trustees in transactions not connected with the trust are put upon inquiry, and accept payments from the trustee of trust funds in his personal transactions at their peril. Prall v. Hamil, 28 N.J. Eq. 66; Goodell v. Monroe, 87 N.J. Eq. 328.
Not only will the court impress a trust upon the property purchased with the misappropriated funds, but it will also give a personal judgment for any deficiency against the wrongdoers. General Motors Acceptance Corp. v. Larson, 110 N.J. Eq. 305 [159 A. 819].
A decree will be advised impressing a trust for the amount of the defalcation against the land and building in question and directing that any deficiency be paid by Irene Van Blarcom personally and the estate of Frank Van Blarcom. [123 N.J. Eq. at 112, 196 A. 468]
In United States v. Pitoscia, 238 F. Supp. 135 (D.N.J. 1965), the District Court granted defendant's motion to dismiss an indictment for willfully filing a false income tax return for not including the amount that he had embezzled from his employer. The District Court relied upon a portion of the James opinion, supra, that pointed out there had been considerable confusion as to the meaning of certain of its decisions, and hence, there could not be the requisite criminal intent required for "willfulness" in not reporting embezzled funds while that confusion existed. The District Court then considered the applicable law of New Jersey with respect to the property rights of the embezzler.
The fact that the defendant in the case at bar took goods belonging to his employer, sold them to a third party, and subsequently appropriated the proceeds to his own use does not necessarily constitute an act different in nature from that committed in the Wilcox case or the James case where money or cash was taken in the first instance. As was stated by Judge Kalodner in his dissenting opinion in Kann v. C.I.R., 210 F.2d 247, at page 255 (C.A.3rd Cir., 1953):

*109 The government's contention that despite the fact that the Kanns `surreptitiously procured for their own use funds from family owned corporations' the funds so taken were not embezzled is, to say the least, ingenious. `Surreptitiously procured' is undoubtedly more euphonious and less grating on the embezzler's ear; but embezzlement, called by any other name, is still embezzlement.
While the court does not subscribe to the use of State law in determining taxability except where Congress has expressly or implicitly made the operation of the taxing statutes so dependent, it must recognize the reliance placed upon State law in both the Wilcox and James cases in determining whether the funds therein involved constituted embezzled funds. Nor can the Court ignore the plain and unmistakable meaning of the word "embezzlement" and the essential elements of the crime. According to Black's Law Dictionary (Fourteenth Edition) Embezzlement is "the fraudulent appropriation to his own use or benefit of property or money intrusted to him by another, or by a clerk, agent, trustee, public officer, or other person acting in a fiduciary character." [Emphasis supplied] Under N.J.S.A. 2A:102-5, Embezzlement by employees, agents, consignee, factor, bailee, lodger or tenant is proscribed as follows:
Any employee, agent, consignee, factor, bailee, lodger or tenant who embezzles or, with intent to defraud, takes money or receives, retains or appropriates to his own use or the use of another, any property or the proceeds of the sale of the same, or any part thereof, belonging to his employer, principal, consignor, bailor or landlord, is guilty of a misdemeanor. [Emphasis supplied]
In the case of State v. Bobbins, 35 N.J. Super. 494, at pages 497 and 498, 114 A.2d 474, at page 476 (A.D., 1955) embezzlement is described more fully, thus:
Moreover the connotation of the word `embezzles' is obvious. It has had a settled significance in the law from the time of the first judicial declaration that conversion or misappropriation of money or property of an employer or principal by a servant or agent which had been entrusted to him by another, did not constitute common-law larceny. Since then embezzlement has meant generally the intentional and fraudulent appropriation of the property or money of another by a person into whose hands it had lawfully come or to whom it had been entrusted. (Citing cases and authorities.) The definition was so well known that in 1529 the first statute known to deal with such breach of trust made it a felony for any servant to `embesil' his master's caskets, jewels, money, goods, or chattels or any part thereof, above the value of forth shillings. 21 Henry VIII, ch. 7; 3 Coke's Institutes, p. 105.
It has been said that the single word `embezzle' in an indictment contains within itself the charge that the defendant fraudulently appropriated the money or property to his own use. [Emphasis supplied; citations omitted]
Whether it is the misappropriation of money or property in the first instance is of no moment. The plain meaning of the word "embezzlement" encompasses both situations.
In the case at bar the fact that the defendant was in a position to conceal his activities by various devices such as preparing false entries and falsifying *110 inventory books, and in fact did so, is not significant except that it is quite common for embezzlers to attempt to conceal their crimes by employing such devices. [238 F. Supp. at 139-140]
In First National Bank v. Hill, supra, the United States claimed priority for $4,000,000 based on its judgment for unpaid taxes and penalties against Hill, the former president of the bank, who failed to report on his tax returns $4,700,000 he embezzled from the bank. The bank held a judgment for $5,800,000. On a motion for reconsideration that the United States had priority, the bank urged that under state law the proceeds or product of the embezzlement was not the property of the embezzler and, hence, the government's lien could not attach to such property. The District Court agreed and vacated its earlier order to allow the bank to establish its case.
The District Court said:
It has been pointed out to the court by the amicus curiae that while federal law determines whether a state lien is sufficiently choate so as to defeat a federal tax lien, it must first be determined whether the taxpayer had property or a right to property to which the federal tax lien could attach, and this is a matter of state law. The extent of Hill's property interest in the property he allegedly purchased with proceeds of the embezzled funds was not considered in this court's December 22, 1975, order. It is contended that if Hill had no property purchased with embezzled funds, then there would be no property to which the federal tax lien could attach.
As to the principle that state law determines the question of the taxpayer's property rights to which a federal tax lien can attach, the Supreme Court very succinctly stated the rule in Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960):
The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that "in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . .. sought to be reached by the statute." [Footnote and citation omitted]

Id. at 512-513, 80 S.Ct. at 1280, 4 L.Ed.2d at 1368. See also United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960); United States v. Hershberger, 475 F.2d 677 (10th Cir.1973); Ideco Division of Dresser Industries Inc. v. Chance Drilling Co., 422 F.2d 165 (5th Cir.1970); United States v. Gurley, 415 F.2d 144 (5th Cir.1969). The import of this is that a federal tax lien can only attach to a property interest of the taxpayer which *111 exists under state law, and if the taxpayer does not own the property under state law, then the federal tax lien could not attach to such property, and, thus, the federal tax lien could not take precedence over the person with the rights of ownership in the property. In Aquilino, the Court dealt with a situation where subcontractors claimed a right to monies owed the contractor by the owner. The United States was seeking to enforce a tax lien on all property of the contractor. The Court noted that such claims of the subcontractors were not choate but held that if, under the applicable New York law, the contractor were found to hold the monies in trust for the subcontractors, then the contractor would not have such a property interest that the federal tax lien could attach. In Durham, the Court also held that where a general contractor did not have a property interest in the total amount due under a construction contract, the federal tax lien could attach only to that amount of funds which "remain unpaid after the owners have deducted a sum sufficient to pay the subcontractors." 363 U.S. at 526, 80 S.Ct. at 1284, 4 L.Ed.2d at 1374.
....
It is a general rule of common law that no title is acquired by an embezzler, but that such title remains in the victim, who is the beneficial owner of a constructive trust which is imposed on such monies or on property purchased with such money. 38 A.L.R.3d 1354; Dennis v. United States, supra [372 F. Supp. 563 (E.D.Va. 1974)]. This is also the rule in Georgia. Adams v. McGehee, 211 Ga. 498, 86 S.E.2d 525 (1955); Luther v. Clay, 100 Ga. 236, 28 S.E. 46 (1897). In such a situation, the property remains that of the original owner, and the embezzler holds such property as the constructive trustee of the owner. Adams v. McGehee, supra; Luther v. Clay, supra; cf. Murray County v. Pickering, 196 Ga. 208, 26 S.E.2d 287 (1943); Stover v. Atlantic Ice & Coal Corp., 154 Ga. 228, 113 S.E. 802 (1922). Where the constructive trustee has invested such funds or has purchased other property, the real owner can follow it wherever it can be traced. Adams v. McGehee, supra; United States Fidelity & Guaranty Co. v. Richmond County, 174 Ga. 599, 163 S.E. 482 (1932); Knight v. Knight, 75 Ga. 386 (1885).
Since it is undisputed that Hill embezzled approximately $4,700,000 from the Bank, it is clear that he obtained no title to or property rights in these funds and that he obtained no rights to any property which was purchased with these embezzled funds but would instead hold the same as constructive trustee for the Bank, who is the rightful owner. Since a federal tax lien can attach only to a property interest of the taxpayer which exists under state law, it is clear that the federal tax liens now in issue could not attach to any of the subject property if such property were purchased with proceeds from the embezzlement. [412 F. Supp. at 424-425]
In Atlas Inc. v. United States, supra, the District Court held that federal law determined whether a state lien or claim was so far perfected that it prevailed over a federal lien. It then went on to hold that where the bookkeeper of Atlas had embezzled $390,723.48 in a three-year period, Atlas had the *112 right to show that the residence owned by the bookkeeper had been paid in whole or in part with the embezzled funds to the end that such portion of the property that was so acquired was the property of Atlas and not the taxpayer. The conclusion was that the bookkeeper had made the down payment and the regular mortgage payments from her regular salary. But the early payoff of the mortgage could only come from the embezzled funds, hence, Atlas prevailed as to that amount.
The District Court in part said:
Since Atlas' lien was not certain in amount on the date the federal tax lien was perfected; it was inchoate and inferior to the federal tax lien. Atlas, however, is not out altogether. Although federal law determines whether a state lien is sufficiently choate so as to defeat a federal tax lien, it must first be determined whether the taxpayer had property or a right to property to which the federal tax lien could attach, and this is a matter of state law. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). [459 F. Supp. at 1004]
....
It is a general rule of common law that no beneficial ownership is acquired by an embezzler, but that such ownership remains in the victim, who is the beneficial owner of the constructive trust which is imposed on such monies or property purchased with such money. See 38 A.L.R.3d 1354. I find this to be the rule in North Dakota. Under Section 59-01-06 of the North Dakota Century Code, one who obtains property as an implied trustee for the one who is entitled to the property. The wrongdoer obtains no more than naked legal title to the property and holds it as a trustee for the benefit of the party who should have it. See Redman v. Biewer, 78 N.D. 120, 48 N.W.2d 372 (1951); Hyland v. Tousley, 67 N.D. 612, 275 N.W. 340 (1937); Arntson v. First National Bank of Sheldon, 39 N.D. 408, 167 N.W. 760 (1918); Widman v. Kellogg, 22 N.D. 396, 133 N.W. 1020 (1911). Generally, where a constructive trust has invested such funds or has purchased other property, the real owner can follow it wherever it can be traced. See Restatement of Restitution, Sec. 202 (1936).
Since it is undisputed that Mrs. Dohn embezzled approximately $390,000 from Atlas, it is clear that she obtained no property rights in these funds and that she obtained no rights to any property which was purchased with these embezzled funds but would instead hold the same as constructive trustee for Atlas, who is the rightful owner. Since a federal tax lien can attach only to a property interest of the taxpayer which exists under state law, it is clear that the federal tax liens now in issue could not attach to that part of the subject property that was purchased with proceeds from the embezzlement. [459 F. Supp. 1004-1005]
*113 To understand the nature of the property which the receiver has, it is appropriate to consider the purpose of the receivership.
In Trustees of the Clients' Security Fund v. Beckmann, 143 N.J. Super. 548, 364 A.2d 15 (Ch.Div. 1976), Judge Gelman said:
With the adoption of R. 1:28-8 the Supreme Court has authorized proceedings which are sui generis in the law of this State. The rule authorizes the institution by the trustees of a general equity receivership action against attorneys to enable the court to marshall all of the assets of an attorney's estate for the protection of his clients, the Trustees and his creditors. While equity receiverships involving specific assets of an individual debtor have long been recognized, see Kuhl v. Martin, 28 N.J. Eq. 370 (Ch. 1877), the appointment of a receiver for the entire estate of an individual is a proceeding novel to this jurisdiction. Nevertheless, and apart from the Supreme Court's delegated powers to regulate the conduct and affairs of attorneys, it is generally acknowledged that special circumstances justify the use of court's inherent equity powers to take custody of and preserve the assets of individuals, especially where claimants may otherwise be prejudiced by misconduct of a fiduciary. 4 Pomeroy's Equity Jurisprudence (5 ed. 1941), Sec. 1334. [Id. at 553-554, 364 A.2d 15]
R. 1:28-8 authorizes the Trustees of the CSF on the conditions stated in the rule to apply for "the appointment of a custodial receiver to take possession of the property of an attorney, including, but not limited to, property incident to his law practice. Provided the Trustees, first find a reasonable probability that a claim or claims will be presented to the Fund on account of the alleged misconduct of the attorney...."
A receiver appointed under R. 1-28-8 is appointed to take custody of all the property of an attorney and to marshall the assets. The condition precedent to the appointment is "alleged misconduct of the attorney" and is not premised on any ground of insolvency; hence, it is clear that there is no intent to encroach upon other insolvency laws of New Jersey or any provisions of the Bankruptcy Code enacted by the Congress under its exclusive power and U.S. Const., Art. I, § 8.
A receiver appointed under R. 1:28-8, in the performance of his or her duties, is to take custody of all property of the attorney, that is property that may have been acquired prior to *114 misconduct, as in Beckmann, supra, as well as that acquired by the attorney by misconduct, as in the Yucht case, by embezzlement.
Receivers appointed in these cases should attempt to salvage records in the initial stages to be able to establish those facts.
As pointed out in the section of Pomeroy, Equity Jurisprudence, cited in the quotation from Beckmann, supra, equity has the power to appoint a receiver when a fiduciary, such as a trustee, is managing affairs to his or her own benefit. In the cases involving attorneys there is a public interest in having some responsible individual promptly take charge of files and contact clients so that actions will be prosecuted and not barred by the statute of limitations or other defenses and estates of decedents will be administered, etc.
Aside from the need to contact clients, so that arrangements can be made for the substitution of attorneys, there is also a need to consider what fee the receiver may have lawfully earned, and be entitled to, and the manner of securing payment.
In the Yucht case there is evidence in the accounting that there were a number of workers' compensation cases and personal injury actions which were turned over to other attorneys. Upon completion of those matters, a portion of the fees were paid to the receiver proportionate to the work done by Yucht. Those arrangements were made before the receiver turned the file over.
Before addressing the specifics of the allocation between the proceeds of the embezzlement and other property held by the receiver, the court considers the contention of CFS that the claims for taxes should not be recognized since there was a failure to comply with paragraph (f) of the order dated December 15, 1982.
Upon the appointment of a receiver, the property of which the receiver is to take custody is deemed to be in the custody of the court as of the time of the receiver's appointment. *115 See Generotzky v. Barnay Hotel Company, 85 N.J. Eq. 63, 95 A. 865 (Ch. 1915) (After appointment of receiver, owner of hotel issued a distress warrant on certain money in the hotel safe and seized it. On return of order to show cause for turnover of the funds brought by the receiver, the court held that the money was the property of the hotel and directed its turnover.) The court said:
At the time the money was seized the receiver had not qualified by filing his bond and oath of office, and it is urged that in consequence the title to the money so seized had not vested in the receiver.
That position is clearly untenable. In Gallagher v. True American Publishing Co., 75 N.J. Eq. 171 [71 A. 741], it is held that under section 68 of our Corporation act (2 Comp.Stat. p. 1644) title to the property of the insolvent corporation vests in its receiver immediately upon the appointment being made, and that the statutory requirement for a bond and oath of office is not a prerequisite to the vesting of title in the receiver. It is also there held that the hours of the day on which rights arise will be ascertained by the court to determine priority of rights arising on the same day. It follows that at the time when the money here in question was seized title to the money had vested in the receiver. The money seized was, in consequence, no longer the property of the insolvent corporation, and a creditor of that corporation had no right to seize it. [Id. 85 N.J. Eq. at 64, 95 A. 865]
The fact that a custodial receiver does not take title to property does not change the rule of law. In Hoffman v. Kahn, 119 N.J. Eq. 171, 181 A. 527 (Ch. 1935), a judgment creditor of a mental incompetent obtained a writ of attachment against income-producing real property in Newark, New Jersey. The sheriff appointed an auditor to collect the rents. The guardian applied to have the lands sold and the auditor account for, and pay over, the rents collected.
After setting forth the equity precedents from England and New Jersey, that the incompetent's property is in the custody of the court, Vice Chancellor Bigelow said:
Although the guardian of a lunatic has no title to the property of his ward either in trust or otherwise, yet he is caretaker of the estate. Cooper v. Wallace, 55 N.J. Eq. 192 [36 A. 575]. The lunatic's property within the state becomes a fund under control of the orphans court. In re Farrell, supra [51 N.J. Eq. 353, 27 A. 813]. [Id. 119 N.J. Eq. at 172, 181 A. 527]

*116 ....
Property in custodia legis is not subject to seizure on attachment or execution, although the defendant's interest in the property may be attached. Crane v. Freese, 16 N.J.Law 305; Conover v. Ruckman, 33 N.J. Eq. 303. For example, money raised on an execution and held by the sheriff, cannot, by virtue of an attachment, be taken out of the sheriff's hands; but the sheriff must retain it despite the attachment and pay it into court in the cause in which the execution issued. The same rule applies to property in the hands of a receiver. "The court never allows any person to interfere either with money or property in the hands of its receiver, without its leave, whether it is done by the consent or submission of the receiver or by compulsory process against him." De Winto v. Mayor of Brecon, 28 Beav. 200. The moment a receiver is appointed, the property which he should take into possession is considered to be in custody of law so as to preclude interference by others. Generotzky v. Barnay Hotel Co., 85 N.J. Eq. 63 [95 A. 865]. The guardian of a lunatic appointed under our statute is an agent of the state which acts through the instrumentality of the orphans court. At the time Mrs. Kahn sued out her attachment, the lunatic's property was already in the custody of the orphans court. Acting under the writ of attachment and his appointment as auditor, the auditor has taken possession of the real estate away from the guardian and is now collecting the rents and proposes to sell the property. This action by the auditor is not legally justifiable. [Id. 119 N.J. Eq. at 174, 181 A. 527]
See 65 Am.Jur.2d, Interference by suit proceeding levy, sale, or enforcement of lien, § 168; Kneisel v. Ursus Motor Corp., 316 Ill. 336, 147 N.E. 243 (1925) (annotated 39 A.L.R. 8 (1925)).
In I/M/O M.V. Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689 (1893), Tyler, Sheriff of Aiken County, South Carolina, petitioned for a writ of habeas corpus directed to the United States Marshal for the District of South Carolina, to whose custody the federal court in South Carolina had committed him until Tyler paid a fine or purged himself of contempt.
The federal court had appointed a receiver for a railroad with power to operate and protected his possession by an injunction. The receiver had applied in 1891 for an injunction against the treasurers and sheriffs of 18 counties from the treasurers issuing tax warrants and the sheriffs levying those warrants for the difference in taxes the receiver admitted were due based on his valuation and those due based on their valuations which were challenged on constitutional grounds. Arrangements were made for the receiver to pay the admitted taxes, the *117 counties to accept them without prejudice, and the federal court to hear the matter but the injunction was issued. Before the hearing the next year's taxes were levied with the same differences. The treasurers accepted the receiver's tendered payments but issued warrants for the difference. Tyler levied upon railroad cars which were in the custody of the receiver.
Tyler caused the cars to be chained to the tracks and disrupted the operation of the railroad's freight yard for 12 days. The receiver filed an application to have Tyler held in contempt and to vacate the levy. Tyler answered that he was acting in accordance with the laws of South Carolina and carrying out the duties of his office. The federal court adjudged Tyler in contempt, imposed a fine of $500, and directed that judgment issue for that amount. It further ordered that he be held by the Marshal until the fine was paid or he purged himself of the contempt.
On petition to the Supreme Court, reference was made to the means of appeal from excessive levies under the laws of South Carolina.
Justice Fuller in part said:
The property in question was in the custody of the circuit court, in a cause within its jurisdiction, and protected by injunction. The power exercised was the power to protect the property in the custody of the court from invasion, and in order to sustain the receiver's application the ordinary grounds of equity interposition were not required to be set forth. Whether inadequacy of remedy at law in respect of the disputed taxes, or the requisite jurisdictional amount, or diverse citizenship, were shown to exist, was not and could not be matter of inquiry.
....
No rule is better settled than that when a court has appointed a receiver, his possession is the possession of the court, for the benefit of the parties to the suit and all concerned, and cannot be disturbed without leave, intentionally interferes with such possession, he necessarily commits a contempt of court, and is liable to punishment therefor. Wiswall v. Sampson, 55 U.S. 14 How. 52 [14 L.Ed. 322]; Taylor v. Carryl, 61 U.S. 20 How. 583 [15 L.Ed. 1028]; Davis v. Gray, 83 U.S. 16 Wall 203 [21 L.Ed. 447]; Krippendorf v. Hyde, 110 U.S. 276] [4 S.Ct. 27, 28 L.Ed. 145]; Barton v. Barbour, 104 U.S. 126 [26 L.Ed. 672]; Gumbel v. Pitkin, 124 U.S. 131 [8 S.Ct. 379, 31 L.Ed. 374].

*118 ....
In this case, instead of issuing an attachment against the petitioners at once for forcibly seizing the rolling stock of this railroad under the circumstances appearing upon the face of the record, the court adopted the course of serving him with a rule to show cause, and with an order restraining him, in the meantime, from interference with the property. The petitioner refused to release the property upon request of the receiver, and persisted in his attempt to hold possession thereof by force in disregard of the order of the court.
The general doctrine that property in the possession of a receiver appointed by a court is in custodia legis, and that unauthorized interference with such possession is punishable as a contempt, is conceded; but it is contended that this salutary rule has no application to the collection of taxes. Undoubtedly property so situated is not thereby rendered exempt from the imposition of taxes by the government within whose jurisdiction the property is, and the lien for taxes is superior to all other liens whatsoever, except judicial costs, when the property is rightfully in the custody of the law, but this does not justify a physical invasion of such custody and a wanton disregard of the orders of the court in respect of it. The maintenance of the system of checks and balances characteristic of republican institutions requires the co-ordinated departments of government, whether Federal or state, to refrain from any infringement of the independence of each other, and the possession of property by the judicial department cannot be arbitrarily encroached upon, save in violation of this fundamental principle.
The levy of a tax warrant, like the levy of an ordinary fieri facias, sequestrates the property to answer the exigency of the writ; but property in the possession of the receiver is already in sequestration, already held in equitable execution, and while the lien for taxes must be recognized and enforced, the orderly administration of justice requires this to be done by and under the sanction of the court. It is the duty of the court to see to it that this is done; and a seizure of the property against its will can only be predicated upon the assumption that the court will fail in the discharge of its duty, an assumption carrying a contempt upon its face. [149 U.S. at 182, 13 S.Ct. at 789, 37 L.Ed. at 694-695]
But the rule in I/M/O Tyler, supra, is not followed in all jurisdictions. In Johnson v. Smith, 297 N.Y. 165, 77 N.E.2d 386, 3 A.L.R.2d 888 (App.Ct.N.Y. 1948), cert. den. 335 U.S. 824, 69 S.Ct. 47, 93 L.Ed. 378 (1948), Johnson was the successor receiver for real property, appointed by the Supreme Court of Albany County, in a partition action who was directed to collect "all rents due and unpaid or to become due pending this action." The holder of the lands appealed from the judgment of the Appellate Division reversing the trial court decision that the complaint (seeking to set aside the deeds issued by taxing *119 authorities without leave of the court were invalid) failed to state a cause of action.
The partition action among tenants in common started in 1925. In 1935, the first receiver was appointed. In 1940, Johnson was appointed. The real estate taxes were not paid for 1938 and 1940. The county treasurer sold the real property to the County of Albany on two tax sales. The county then sold the real property to defendant grantees.
Five years after the last tax sale, Johnson filed suit to set aside the conveyances because the county treasurer had sold the real estate without first obtaining the permission of Johnson who was in possession of the real estate as a court-appointed receiver; hence, the sales were void. The court of appeals reversed the appellate division decision.
Justice Fuld said that the Legislature had provided that all real estate was taxable unless specifically exempted by statute. He further stated that the statutes required the county treasurers to sell real estate on which taxes were not paid.
After citing County of Nassau v. Day, 266 A.D. 738, 41 N.Y.S.2d 155, aff'd 291 N.Y. 732, 52 N.E.2d 956 (App.Ct. 1943) and Bonded Municipal Corporation v. Carodix, 266 A.D. 737, 41 N.Y.S.2d 154, aff'd 291 N.Y. 733, 52 N.E.2d 956, Justice Fuld said in relevant part:
In the two cases last cited, we rejected a contention that the failure of a county treasurer to obtain court leave and approval for a tax sale invalidated such a sale where the property was held by trustees appointed by the Supreme Court in reorganization proceedings brought pursuant to the Schackno and Mortgage Commission Acts, McK. Unconsol. Laws, Sec. 4871 et seq. Those decisions apply with equal force here; insofar as the problem before us is concerned, there is little to differentiate the receiver in a partition suit from a trustee in a Schackno or Mortgage Commission Act proceeding. See Matter of Bond & Mortgage Guar. Co. 288 N.Y. 270, 277, 43 N.E.2d 38, 41. In the absence of specific statutory provision restraining tax collection agencies during the pendency of the action, or during the receivership, there is no basis for a claim that the county or its treasurer should have sought permission from the court before selling the property for unpaid taxes or delivering the tax deeds.
Paramount and vital is the circumstances that, in selling the property, the county treasurer acted solely in accordance with the mandate of the statute. It *120 may well be that court approval is required if in possession is a statutory receiver or trustee or a receiver or trustee appointed by a court pursuant to a statute  such as the Federal Bankruptcy Act, 11 USCA Sec. 1, et seq.  granting extremely broad powers. Quite apart from any other consideration under the Bankruptcy Act, title to the property vests in the trustee (Bankruptcy Act, Sec. 70; U.S.C.A. tit 11, Sec. 110). A receiver in partition, on the other hand, obtains no title to the property (Rinehart v. Hasco Building Co. 153 App.Div. 153, 138 N.Y.S. 258, affirmed 214 N.Y. 635, 108 N.E. 1106); title remains vested in the owners who are the parties to the partition action. As is evident from the order of appointment, the receiver is given merely the right to manage the premises on behalf of those owners until the action has been concluded. The court, by appointing a receiver in a partition, undertakes, not to preserve the rights of the parties in the property against the world, but simply to preserve their rights as against each other. [3 A.L.R.2d 891-892]
....
To hold, as the Appellate Division has, that the county treasurer must obtain permission from the court before selling for nonpayment of taxes so as to permit the court to "determine whether the property should be sold or held for the benefit of parties interested and the municipality" [Johnson v. Smith], 272 App Div 6, at page 9, 69 N.Y.S.2d 68, at page 71, is to assume the existence of a power in the court to prevent the tax sale or postpone it indefinitely. The consequence of such a decision would be the creation of tax exemption by judicial fiat in favor of receiver held property, perhaps as to amount, certainly as to time and method of payment  a result clearly contravening the constitutional provision that "Exemptions from taxation may be granted only by general laws" N.Y. Const, art. XVI, Sec. 1. On the other hand, if a court were under the necessity of granting leave to a county treasurer  because the statute directs him to sell  the application to the court would be but an empty and futile gesture, and it should not be required. Or if a regard for propriety does demand it  and I doubt that it does  failure to comply with such a formality should not result in voiding the sale. [Id. at 892]
....
No public policy is to be served by requiring the court  because of a supposed involvement of its dignity  to aid taxpayers in avoiding or delaying the payment of taxes owing by them and necessary for the carrying on of government. In the present case, the taxes were not paid, and the county treasurer, in selling the property under compulsion of the Tax Law, complied strictly with every applicable provision. The sales as well as the tax deeds and the subsequent conveyances, being valid and proper, are immune from attack. The owners of the property and the receiver were granted a privilege by statute to redeem; they chose not to avail themselves of it. [Id. at 893]
The author of the annotation relative to that case expressed the following opinion:

*121 The only serious attempt at reconciling the two opposite views was made in Johnson v. Smith (1948) 297 N.Y. 165, 77 N.E.2d 386, 3 A.L.R.2d 888 (cert. den. (1948) 335 U.S. 824, 93 L.Ed. (Adv 23) [378], 69 S.Ct. 47). The distinction suggested in this case is to the effect that court approval is required where in possession is a statutory receiver or trustee, or a receiver or trustee appointed by a court pursuant to a statute granting extremely broad powers to the trustee or vesting the title to the property in him, while no such consent is necessary where the reason for the custody is the preservation of the rights of the parties in the property as against each other and not against the world.
Despite the fact that the rationale behind the two conflicting views seems to indicate a more fundamental difference going to the roots of our concept of interrelationship between the various functions of government, a perusal of the actual decisions in the light of the distinction suggested in the Johnson case shows that they can be classified, as a whole, in accordance with the theory advanced therein. Such a distinction has much to recommend it. [Id. at 908]
In 20 N.J. Practice, (Skills and Methods) (2 ed. 1973) § 1495, states in part:
Assets in the hands of the receiver are deemed to be in the hands of the court and are thereby withdrawn from the jurisdiction of all other courts. Thus, the appointing court has ancillary power to hear and determine all questions respecting title, possession and control of the property in its hands and all liens thereon. [at ___]
The authority cited for the last statement is Riedinger v. Mack Machine Co., Inc., etc., 117 N.J. Eq. 334, 175 A. 790 (Ch. 1934). In that case, the receiver had possession of certain machines and personal property pursuant to agreements with the insolvent corporation for which he was appointed receiver and Frick Company. Frick filed a petition claiming the goods under the agreement. The receiver claimed the goods.
With respect to its jurisdiction to hear and decide the claims the court said:
Regardless of the character of the property, the dispute is usually determined by this court, in the cause in which the receiver was appointed, and in as summary a manner as the nature of the controversy permits. The general principle was expressed in Murphy v. John Hofman Co., 211 U.S. 562; 29 S.C. 154 [53 L.Ed. 327]; "But where the property in dispute is in the actual possession of the court of bankruptcy, there comes into play another principle, not peculiar to courts of bankruptcy but applicable to all courts, federal or state. Where a court of competent jurisdiction has taken property into its possession through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. The court having possession of the property has an ancillary jurisdiction to hear and determine all questions respecting the title, *122 possession or control of the property. In the courts of the United States, this ancillary jurisdiction may be exercised though it is not authorized by an statute. The jurisdiction in such cases arises out of the possession of the property and is exclusive of the jurisdiction of all other courts, although otherwise the controversy would be cognizable in them." To the same effect, although not in a bankruptcy case but in an equity receivership, in Wabash Railroad Co. v. Adelbert College, 208 U.S. 38; 28 S.C. 182 [52 L.Ed. 379]. The jurisdiction is exercised in a summary manner. Ex parte City Bank, 44 U.S. [3 How.] 292; 11 L.Ed. 603; Clay v. Waters, 178 Fed.Rep. 385; 101 C.C.A. 645; Priest v. Weaver (C.C.A.), 43 Fed.Rep. (2d) 57. A recent case reiterating the power of the bankruptcy court to adjudicate liens is Isaacs v. Hobbs Tie and Timber Co., 282 U.S. 734; 51 S.C. 270 [75 L.Ed. 645].
It is settled law that in the decision of questions arising in the administration of the assets of an insolvent corporation, our statute must be regarded as essentially a bankrupt act and the rules to be applied are those which control in bankruptcy proceedings. Butler v. Commonwealth Tobacco Co., 74 N.J. Eq. 423 [70 A. 319]; Nutz v. Murray-Nutz, Inc., 109 N.J. Eq. 95 [156 A. 668]; Grobholz v. Merdel Mortgage Investment Co., 115 N.J. Eq. 411 [170 A. 815]; Jersey City Welding and Machine Works v. Hudson County White Co., 116 N.J. Eq. 548 [174 A. 516]. The last two cases are not opposed to the rule that this court should decide questions relative to property in the hands of its receiver; they hold, in conformity with the federal statute, that a money claim of a receiver against a third party should not be decided in a summary manner in the receivership cause.
Our statute, like the federal act, imposes on the court and to its agent, the receiver, broad duties and powers. To perform the duties cast upon it, the court necessarily has power to determine the title to and liens on the estate which it administers. Chancery has jurisdiction of the controversy stated in the receiver's cross-petition. [Id. 117 N.J. Eq. at 336-337, 175 A. 790]
In 20 N.J. Practice, supra, in § 1502, the author cautions that, under N.J.S.A. 14A:14-15(1), all claims of creditors not filed pursuant to the notice published under that statute may be forever barred, except where the creditor shows good cause for not filing it and the Superior Court allows the claims to be prosecuted against: (a) the corporation to the extent of undistributed assets; or (b) if (a) is not sufficient, the shareholders, to the extent of their ratable share of the claim out of the assets distributed to the shareholders in liquidation or dissolution, may be forever barred. To the extent that the statute authorizes a discharge of a debt it may be invalid on the ground that it is a bankruptcy law over which the United States has exclusive jurisdiction.
*123 In terms of the I.R.S., 26 U.S.C.A. § 6036 provides that every receiver in a receivership proceeding must give the I.R.S. written notice of the receivership proceeding within ten days of the appointment of the receiver. I.R.C. 301.6036-1. The giving of that notice affords certain rights to the I.R.S. and have an impact on the statute of limitations that can run against the I.R.S. 14 Mertens, The Law of Federal Income Taxation, Bankruptcy, Receivership and Priorities, § 354.08, Statute of Limitations.
In the Yucht case, the claim of the State is under the Unemployment Compensation Law, N.J.S.A. 43:21-1 et seq. In State Division of Employment Security v. Pilot Manufacturing Co., 83 N.J. Super. 177, 182, 199 A.2d 78 (Law Div. 1964), the contributions due under said law are described as taxes. From the provision of N.J.S.A. 43:21-14(c), (d) and (e), since 1974 the State has had the following powers with respect to unpaid contributions:
(c) If any employer shall fail to make any report as required by the rules and regulations of the division pursuant to the provisions of this chapter (R.S. 43:21-1 et seq.), the controller may make an estimate of the liability of such employer from any information it may obtain, and, according to such estimate so made, assess such employer for the contributions, penalties, and interest due the State from him, give notice of such assessment to the employer, and make demand upon him for payment.
(d) After a report is filed under the provisions of this chapter (R.S. 43:21-1 et seq.) and the rules and regulations thereof, the controller shall cause the report examined and shall make such further audit and investigation as it may deem necessary, and if therefrom there shall be determined that there is a deficiency with respect to the payment of the contributions due from such employer, the controller shall assess the additional contributions, penalties, and interest due the State from such employer, give notice of such assessment to the employer, and make demand upon him for payment.
(e) As an additional remedy, the controller may issue to the Clerk of the Superior Court of New Jersey a certificate stating the amount of the employer's indebtedness under this chapter (R.S. 43:21-1 et seq.) and describing the liability, and thereupon the clerk shall immediately enter upon his record of docketed judgments such certificate of an abstract thereof and duly index the same. Any such certificate or abstract, heretofore or hereafter docketed, from the time of docketing shall have the same force and effect as a judgment obtained in the Superior Court of New Jersey, and the controller shall have all the remedies and may take all the proceedings for the collection thereof which *124 may be had or taken upon the recovery of such a judgment in a civil action upon contract in said court. Such debt, from the time of docketing thereof, shall be a lien on and bind the lands, tenements and hereditaments of the debtor.
Based on the provisions of the federal law and state law heretofore cited, this court concludes that Justice Fuld's remarks in Johnson v. Smith, supra, are appropriate on the facts in this case. The receiver has been informed of the respective claims.
Returning to the language of (f) in the order dated October 14, 1982, recited at the beginning of this opinion, the purpose of that language was to prevent those with claims against Yucht from securing judgments and other liens against Yucht's property which the receiver held in custodia legis.
The difficulties that can arise in a receivership where there is no restraint against attachment or execution is dramatically illustrated in I/M/O Tyler, supra. Seizure of a small amount of personal property stymied the operation of an ongoing enterprise of much greater value that a court had control over.
The fact pattern in Johnson v. Smith, supra, is different. There, a well known system of tax laws was known to the receiver and the record owners of the land. Justice Fuld's holdings are, in this court's opinion, appropriate. All involved knew what they had to do to save the real property. The receiver could account for the rents collected and have them disbursed as the interests of the parties required.
This court does not have the power to require the I.R.S. to submit to its jurisdiction any questions as to the proper interpretation of the federal tax laws or the proper amount of taxes due the United States, but only the question of whether there is property to which any federal lien can attach and whether the lien is valid. Riedinger v. Mack Machine Co., Inc., supra.
By its conduct, the I.R.S. has not acted in the manner that Tyler did but made its position known to the receiver herein. By assuming that CFS has not been made whole by $20,086.35 the amount of the shortfall, CFS asserts that it is entitled to the *125 entire balance held by the receiver, i.e., $15,864.58, whether those receipts are the product of embezzlement or are the separate property of Yucht.
To the extent that the receiver holds property that is allocable to the proceeds of the embezzlement, CFS, by reason of its subrogation rights, should be entitled to those funds.[2]
For reasons heretofore stated, the I.R.S. has no claim on the proceeds of the embezzlement and not the property of Yucht the taxpayer. For similar reasons the court determines that CSF is entitled to property that is the product of embezzlement against the claims of the New Jersey Unemployment Security Agency ("agency").
CFS has urged that the perfection, if any, by the I.R.S. and the agency after the order dated October 14, 1982 should be declared invalid because said order was not complied with by seeking leave of the court first. As to the federal and state taxing authorities, this court concludes that it could not have denied the permission to perfect such interests. For the reason expressed by Justice Fuld in Johnson v. Smith, supra, the court concludes that such claims must be considered.
Based on the nature of the assets in the Yucht law office, the receiver's description of their age, and the appraisal report of Peter Hin as to their value, the court concludes that the proceeds of that sale are the product of property that Yucht acquired other than from embezzled funds, except for two electronic typewriters, one eight-foot cabinet, and volumes of the New Jersey Reports purchased after 1979 when the embezzlements started. They are listed as category one and total $7,200 for all items, including the exceptions.
The proof of claims filed by the I.R.S. totals $3,743.57 up to September 26, 1983. Said proof of claims sets forth the date *126 on which the federal liens arose, but priority is asserted based on 31 U.S.C.A. § 191, now 31 U.S.C.A. § 3713. The statute only gives priority where the events specified therein have occurred, insolvency, taxpayer has made an assignment for the benefit of creditors, or committed an act of bankruptcy.
None of these grounds are the basis for the commencement of a receivership under R. 1:28-8. The basis for such action is the reasonable probability that the attorney engaged in misconduct that has led or is likely to lead to the suspension or revocation of the attorney's license to practice law and that claims will be filed with the CSF.
There is no proof that during the period of this accounting Yucht was insolvent, particularly as of the date of the proof of claim. Cf. United States v. Equitable Life Assurance Society of the United States, 384 U.S. 323, 324, 86 S.Ct. 1561, 1562, 16 L.Ed.2d 593, 596-597, 86 S.Ct. 1561 (1966), rev'g Equitable Life Assurance Society of the United States v. Bagin, 45 N.J. 206, 212 A.2d 25 (1965) (Attorney fee allowed under then R. 4:55-7(c) in foreclosure action were inchoate interests under then applicable federal tax lien laws; hence, the U.S. Supreme Court held IRS had priority under 26 U.S.C.A. §§ 6321-6323 but in absence of proof of insolvency 31 U.S.C.A. § 191 (now § 3713) did not afford a basis for priority.).
Counsel for the I.R.S. alternatively asserts that the I.R.S. has a lien under 26 U.S.C.A. § 6321. The copy of the notice of tax lien filed with the proof of claim recites that Yucht was given notice that taxes, penalties, and interest were due; that demand for payment was made; that no payment was made; and that a lien was claimed under §§ 6321, 6322 and 6323. The lien was in favor of the United States "on all property and rights to property belonging to the taxpayer for the amount of these taxes, interests, penalties, and costs as they may accrue."
That "notice is dated August 9, 1983. The court notes it is after October 14, 1982. The contents of the notice are set forth *127 supra. The taxes total $1,100.54. The proof of claim sets forth the interest due through 1982.
That notice was filed in the proper office to be effective against real and personal property. See State Division of Employment Security v. Pilot Manufacturing Co., supra.
If the notice of lien filed on August 3, 1983 is effective, then the I.R.S. has a lien that will date back to the date that the taxes were assessed, 26 U.S.C.A. § 6322. It has been described as a secret lien in a number of cases. To limit its effect Congress has set forth various categories of creditors that will not be effected by it unless they have notice of it or the I.R.S. has filed notice of the lien claim before they acquired property from the delinquent taxpayer, 26 U.S.C.A. § 6323.
In asserting a claim to lien status, there must be proof that the I.R.S. met all statutory criteria specified to the creation of the lien. The recital that demand was made in the notice placed on record is not proof of that fact. Cattani v. Korsan, 29 N.J. Super. 581, 103 A.2d 51 (Ch.Div. 1954), app. dism. 32 N.J. Super. 210, 108 A.2d 110 (App.Div. 1954).
In Cattani, the owners of land had filed a written contract and specifications for the construction of a home of record. The general contractor defaulted when there was a balance due of $5,653. Subcontractors, materialmen, and laborers filed stop notices and served the owners. Their notices exceeded the balance due. The United States intervened and asserted a tax lien claim against the amount due the general contractor arising from the general contractor's failure to pay income taxes. Then Judge Haneman held that the United States failed to prove its case:
The question now raised by the mechanics lien creditors is whether the United States of America is entitled to any lien, it having failed to prove, consistent with section 3670 of Title 26 of the U.S. Code, that a "demand" was made upon the defendant Korsan. There is no proof before this court that any such demand was ever made. The statute express provides that the lien shall arise only after demand.

*128 In U.S. v. Allen, 14 F. 263 (C.C.M.D.Tenn. 1882), and In re Baltimore Pearl Hominy Co., 5 F.2d 553 (C.C.A. 4 1925), it was held that such demand must have been made on the taxpayer even though it was informal in nature, before the lien arose. The mere statement contained in the notice of federal tax lien filed with the County Clerk of Burlington County "which after demand for payment thereof remained unpaid" is not sufficient for the present purposes. It is a mandatory requirement, both under the exact language of the statute and of the adjudication in the two above referred to cases, that such demand must be made. As a condition precedent to establish its lien and priority, it was necessary that the United States of America make proof of such demand. Absent any such proof, the said United States of America has failed in a vital respect.
Consistent with the foregoing, is therefore here held that the United States of America is not entitled to any priority in the funds here in court. [29 N.J. Super. at 584-585, 103 A.2d 51]
In United States v. Ettelson, 159 F.2d 193 (C.A. 7 Cir.1947), the United States appealed from a judgment denying its assertion of a lien under the predecessor of 26 U.S.C.A. § 6321 et seq. It urged its lien for unpaid income taxes predated the certificates for unpaid real estate taxes for 1939 and subsequent years held by an individual and the municipality where the land owned by a decedent was located.
The Court of Appeals reversed. It held that the United States had established that the assessment had been made within the requisite time periods. It then noted that the district collector had filed a proof of claim with the decedent's estate for unpaid income taxes for the years 1934 through 1937 which was not objected to and allowed by the probate court. It held based on the date of the proof of claim that there was an inescapable inference that the district collector had the assessment lists in his possession on that date. It said:
Furthermore, we agree with the District Court that the filing of the claim in the Probate Court against the estate of the deceased taxpayer was a demand of payment made at the only place that it could be made. That being so, the amount demanded was a lien upon all of the property of the taxpayer, pursuant to Section 3670 of the Internal Revenue Code. Section 3671 of the Code fixes the time when the lien shall arise as the time the assessment list was received by the Collector. That he had the assessment lists on September 30, 1938 we have held, and the lien was then continuing unless the liability for the amount claimed was satisfied or became unenforceable by reason of lapse of time. [159 F.2d at 196]
*129 That court stated since the claim was filed in the probate court, and therefore, action had been taken to enforce the lien within the meaning of the relevant sections of the Internal Revenue Code such that the periods of limitations wre tolled.
Judge Biggs, in a two-to-one decision in In re Fidelity Tube Corporation, 278 F.2d 776 (3 Cir.1960), after four arguments, held that the district director had effectively made a demand on the taxpayer by filing a proof of claim in the bankruptcy on the ground that it was the only place where the demand could be made. Id. at 780. The decision in United States v. Ettelson, supra, was cited as well as authorities to the contrary.
Judge Kalodner cited In re Lambertville Rubber Co., 111 F.2d 45 (3 Cir.1940), where the court of appeals had reversed the trial court's failure to surcharge a trustee who had paid claims to the I.R.S. and State of New Jersey in a bankruptcy proceeding where the taxing authorities had not taken steps to perfect the tax liens before the petition in bankruptcy was filed. The emphasis was on the need to establish that the taxing authorities had complied with the law. The United States Supreme Court denied certiorari, 364 U.S. 828, 81 S.Ct. 66, 5 L.Ed.2d 56 and reargument was denied, 364 U.S. 944, 81 S.Ct. 457, 5 L.Ed.2d 376.
In the Yucht case, the notice of lien lists the address for Yucht at his old office. The proof of claim lists the address as the prison where Yucht was incarcerated. There is no confusion in the basic papers. Further, the receiver, in this action, is not a successor to Yucht in the sense that an executor is or a trustee in liquidating bankruptcy is to a corporation. This court concludes that the filing of a proof of claim by the I.R.S. and the agency, in this type of proceeding, is not the equivalent of making a demand for payment on the taxpayer. This court concludes that the I.R.S. has failed to establish a lien claim. Since the agency has only filed notices of assessments and not proof that it filed a COD, the agency is not entitled to a lien.
*130 11 U.S.C.A. § 507 sets forth the priority in which claims and expenses are to be paid. Under that section of the Bankruptcy Act, seventh priority is afforded to claims of governments for taxes and custom duties. See 3 Collier On Bankruptcy, (1989) Sec. 507.04 Priority Claims: Sec. 507(a) * * * (7).
Seventh Priority: Taxes and Customs where the limitations on such claims and interrelationship to that section to other provisions of the Bankruptcy Act are discussed. The holders of claims within a given priority if these are not sufficient funds to pay the whole class then they should share pro rata. See 3 Collier Sec. 507.02(3) Priorities Are Strictly Statutory, and cases in footnote one holding that they should share pro rata.
This court agrees with the suggestion in Beckmann, supra, that the principles of the Bankruptcy Act should be followed in determining priorities. But since this court has no power to discharge debts, it concludes that it will use the order of priorities, but ignore limitations imposed by non-dischargeable and dischargeable debts.
The court finds that the limitation based on the value of the debtor's interest in property may be applied on equitable principles in the case by substitution of the word owner for debtor.
The taxes that are accorded priority under 11 U.S.C.A. § 507 are not given preference as to one another. If there are insufficient funds to pay all, then they share pro rata.
The court concludes that the I.R.S. claim for $3,743.57 and the agency claim for $33,452.63 are for taxes and are entitled to priority as against property owned by Yucht.
No challenge has been made to the claims filed by either taxing authority that any part of the claim was barred by time limitations at the time of filing. Based on the reasoning in United States v. Ettelson, supra, from and after the filing the time limitations would cease to be operative. The receiver holds $15,864.85.
*131 The question is whether the sources from which that amount arose can be used to allocate funds between Yucht's property and the proceeds of embezzlement.[3]
The court finds that the miscellaneous property (3), $325., was acquired by Yucht from activities unrelated to the embezzlement.
The court previously found that the law office property and library of Yucht essentially was acquired prior to the commencement of the embezzlement activities in 1979.
By letter, the receiver has advised the court that the proceeds from the sale of the excepted items was $850. There will be a formal supplement to the accounting to reflect this. The balance is allocated to Yucht's property, i.e., $6,350.
With respect to the portion of the fees paid to the receiver for work done on files by Yucht, that work did not result from any embezzlement. The receiver's basis of claim to it was for professional services done. Those claims were property rights of Yucht that had to be collected. The receiver took the appropriate action. The court concludes that such fees belong in the category of Yucht's property.
Counsel for CSF has urged that the entire fund of $15,864.85 should be paid to it because CSF has started the proceeding and should be entitled to a constructive trust against Yucht's property.
A constructive trust is a remedial device of equity. It is used to recover property which the holder of the legal title has no beneficial interest in and either acquired it lawfully but is not using it for the purposes for which it was given, or acquired it by improper means.
*132 The Appellate Division in Stewart v. Harris Structural Steel Co., Inc., 198 N.J. Super. 255, 486 A.2d 1265 (App.Div. 1984) said:
Justice Cardozo recognized this principle in Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380 (Ct.App. 1914), when he stated that:
A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.
The Restatement, Restitution Sec. 163 at 661 (1937) explains that "[w]here the owner of property transfers it as a result of a mistake of such a character that he is entitled to restitution, the transferee holds the property upon a constructive trust for him." Section 16 of the Restatement, Restitution at 69 recognizes one type of mistake which entitles a persons to restitution as:
A person who has paid money to another because of an erroneous belief induced by a mistake of fact that in so doing he is performing a contract with the other which is not subject to avoidance, is entitled to restitution of the amount so paid if the transaction is voidable by either party because of the mistake and is avoided.
This is in accord with the holding of our Supreme Court that, "[g]enerally all that is required to impose a constructive trust is finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence ... which has resulted in a transfer of property." D'Ippolito, et al. v. Castoro, et al., 51 N.J. [584] at 589 [242 A.2d 617 (1986)] (emphasis supplied). Moreover, "`[a] constructive trust may arise ... even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it.'" D'Ippolito, et al. v. Castoro, et al., 51 N.J. at 589 [242 A.2d 617] (quoting from Scott on Trusts, Sec. 462.2, p. 3417 (3rd ed. 1967). [Id. at 265-266]
Excluding the excepted amounts, the proceeds were the proceeds of the sale of Yucht's property. So far as the record shows, its acquisition was not the result of any misconduct.
Like any creditor CSF can secure a judgment against Yucht and levy on such property. In this matter CFS may receive the excess of that property after payment of priority claims against such property.
With respect to fees paid for work done by Yucht (2), $6,860, the court determines that they are not the product of misconduct and therefore no constructive trust can be imposed.
The court has considered the principle reflected in Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. *133 1184 (1939) that where one creditor has taken action at his or her own expense that has resulted either in a fund being created or others recovering on their claims those expenses should be shared by one who benefited. The United States Supreme Court distinguished awards of attorney fees from those for attorney fees in mortgage foreclosure in terms of inchoate liens in United States v. Equitable Life Assurance Society, supra. In this case, however, the receiver did the work that generated those fees. Normally, the allowance to him would be the means for compensation.
Frank A. Carlet made no application for a fee. His desire was that, to the extent possible, all funds would go to CSF.
If he will submit an affidavit of services on notice to the present parties, the court will make an appropriate allowance. If the application states that, to the extent allowed, it be paid to CSF, the court will so direct.
With respect to interest earned (4), $4,150, it shall be allocated in the ratio of traced property to total property and Yucht property to total property.
The receiver shall submit an order consistent with this decision.
NOTES
[1] Based on the material in the record, Yucht had a number of cases on contingent-fee arrangements. The affidavit of an assistant prosecutor of Passaic County dated October 14, 1982 annexed to the petition states that when Yucht received a draft or check in payment of a settlement or judgment, Yucht forged the endorsement of the client's name on the instrument.

In the verified proof of claim of CSF, Bossong in his verification, dated May 27, 1988, states in paragraph 5 that, based on assignments, CSF pursued through "... litigation against banks and insurance companies in those instances where Mr. Yucht perpetrated his thefts by virtue of the forging of his clients endorsements on settlement drafts." Cf. Gast v. American Cas. Co. of Reading, Pa., 99 N.J. Super. 538, 240 A.2d 682 (App.Div. 1968). CSF recovered the amount stated above. But none of those funds were turned over to the receiver. The court understands that the recovered funds do not include any funds attributed to fees Yucht had earned.
The accounting of the receiver shows he received funds from the following sources. For convenience the court has rounded the amounts:

 1. Sale of law office equipment and law library ............... $ 7,200.00
 2. Portions of fees allocated to Yucht at time files were turned
 over to successor attorney .................................. 6,860.00
 3. Miscellaneous such as 1942 Series "E" bond, dividends on a
 terminated life insurance policy, coins in the desk 22 cents,
 etc. ............................................... 325.00
 __________
 $14,385.00

The receiver received $5,650 on January 26, 1983 from his predecessor which was advanced by CFS. It was repaid to CFS on September 26, 1983 in the amount of $5,650. There was an advance from the receiver for checks for $5.34 which was reimbursed. These items are not counted as receipts for present purposes. The $5,650 was kept intact in the receiver's bank account until repaid to CSF.

 The receiver also received interest on the bank account of .... 4,150.00
 __________
 $18,535.00
 The receiver also reported that the attorney for Yucht at the
 outset made a payment in restitution by a check drawn on said
 attorney's trust account ...................................... 2,500.00
 __________
 $21,035.00
 ==========
 The Receiver shows total receipts of .......................... $26,624.31
 ==========
 The total of the receipts exclusive of $5,655.34 in exchange
 items is ...................................................... $21,035.00
 The exchange items totalled ................................... 5,655.34
 __________
 $26,690.34
 ==========

[2] See n. 1, supra, in which I have described the sources of the funds that the receiver holds.
[3] See n. 1, supra, for the sources of the funds.